Case No. 20-5174, Waterkeeper Alliance, Inc. et al. A balance v. Michael S. Regan, Administrator, U.S. Environmental Protection Agency, in its official capacity et al. Ms. Castle for the balance, Mr. Lundman for the employees, Mr. Mansinghani for the intervener, State of Oklahoma. Morning, Counsel. Ms. Castle, please proceed when you're ready. Good morning. Thank you, Your Honor. Your Honor, this case is about the right of members of a community to have a say in important decisions that affect their lives and health. By approving Oklahoma's coal ash program, EPA has deprived many communities in Oklahoma of that right. I'd like to talk to you today about three things. First, one of the people who's been affected by EPA's decision. Second, I'd like to tell you about some of those important decisions that are being made behind doors without any public input. And third, I'd like to tell you about how actions speak louder than words and how deprivation of public process has colored EPA's decisions throughout the process of approving Oklahoma's program. Your Honor, Clark Frazier is a retired teacher in Oklahoma. Could I just interrupt you to ask exactly what relief are you seeking in this case? Yes, Your Honor, we're asking you to vacate, overturn EPA's approval of Oklahoma's coal ash program and to direct EPA to issue the minimum guidelines, sending forth minimum standards, minimum guidelines for public participation in state coal ash programs. So, Mr. Frazier, if I might, he has now that he's retired. I think this should actually go to Mr. Frazier. But I, you know, as a follow up to Judge Wilkins' question. So, if the, suppose the court does agree with you, and just for purposes of carrying this through, I'm not saying we will, but suppose we did, then at the end of the day, what would happen, as I understand it, is that the approval for Oklahoma would be set aside. But if that happens, then the consequence of that, as I understand it from the statutory regime, it's 6945 D2B, I think, would mean that Oklahoma becomes non-participating, which, because they wouldn't have the approval. And then the federal standards kick in, which would be the 2015 ones that are in, that are the kind of floor backbone. And then if that's the case, though, then you're not better off, I think, right? So, how have you made out redressability for standing purposes if the upshot of the relief that you're seeking would be to put in place the federal floor under the 2015 rule? Absolutely, Your Honor. So, yes, you're correct that that's what would happen. They would return to being subject to the for now and the immediate future self-implementing federal CCR rule. But EPA, under that same Improvements Act, was directed to initiate a federal permitting program. And if Your Honors were to grant us our relief and find that both the Oklahoma program itself had inadequate public participation, as well as the fact that, as well as the idea that 6974B1 requires the issuance of minimum guidelines, those holdings would effectively, they would compel the same thing to be required, right, for the federal permitting program. And we're talking about units in Oklahoma, coal ash landfills, that have said they're going to continue to operate for many years. That 2015 rule doesn't require landfills to close. And the GRDA landfill says it will continue operating until 2049. EPA has already said, has already proposed a federal permitting program and has said it's going to be, it plans to implement that soon. So, Your Honor, this would allow, this would ensure that when that federal permitting program is put into effect, that those same minimum, that EPA would have to issue those federal, excuse me, those minimum public participation standards for that permitting program, as well as ensure the content of the public participation was adequate to meet 6974B1. But the federal, if you're relying on adjustments to the federal program, then that's either going to happen or not going to happen. How's it affected by the relief that you're seeking? If Your Honors were to find that 6974B1 mandates both significant improvements to the public participation that was provided by Oklahoma and the issuance of these minimum guidelines for state programs, it would also compel the interpretation that minimum guidelines for federal programs were likewise required. Ms. Cassell, that would not be part of our judgment. Our judgment would be to either allow EPA to do what it's done with regard to Oklahoma or not allow. And it sounds like you're asking for something beyond that judgment. You're asking for that judgment plus an advisory opinion from us giving guidance about what certain rules need to be put into place in the future. Are you agreeing that our judgment will not actually provide any redressability for you? Respectfully, Your Honor, if your judgment is that 6974B1 compels the issuance of minimum standards for public participation, that interpretation will necessarily require the same guidelines issued for federal permits. Tell me why I'm wrong about this. You might be describing a holding, but you're still not describing what our judgment would be. Our judgment would be just a thumbs up or a thumbs down for what EPA, for what's been done. That's a fair distinction, Your Honor. Your holding would compel that interpretation. Just to make sure we're on the same page now. You say our holding would, but you would concede that our judgment would not provide you redressability. I'm not conceding that the judgment would not provide us redressability, Your Honor. I'm saying that there would be a limited period before EPA has finalized its permitting program, which we know is underway, that the opportunities available for permitting would not apply to the Oklahomans that I'm discussing here today. But because those landfills are likely to continue operating for many years, in fact, that's exactly what they've said they're going to do, the federal permit program will be in effect before they do major decisions such as closure. So the public participation holding that Your Honor has put in place today, should you rule for us, would inform that, would compel minimum standards for public participation that would improve upon the negligible, and in some instances zero, opportunities for public participation that folks like Mr. Frazier have currently under the Oklahoma regime. I feel like I interrupted, possibly interrupted Judge Sreenivasan's line of question on holding. Okay, if not, then can I ask you about your standing on a different issue, and that's the so-called permits for life. What's the evidence that you submitted to indicate that the injury you allege will result from these permits for life is imminent? Well, Your Honor, there's already been permits issued to several landfills in Oklahoma for which there were no public participation opportunities whatsoever, including the landfill that's upstream of the lake that Mr. Frazier likes to take his sailboat with his grandkids out on. So I'm not, just to clarify, I'm moving away from the question of public participation, and moving toward what I take to be another argument of yours, that even if there were a lot of public participation, Oklahoma, you're injured because Oklahoma grants permits for life. Is that one of your arguments? Yes, Your Honor. And I take it to be that the problem with the permit for life is that in the future, the federal standards might be increased, and Oklahoma might not then require those who currently have permits to update their practices and conform with the elevated federal standards. And is that, in my understanding, your theory? There are two problems with the permits for life, Your Honor. You've identified one of them. The other one is related to the public participation, because with the issuance of these permits for life, because folks like Mr. Frazier will never have a chance again, because it is a permit for life, to be able to weigh in on the management of this polluting facility, and he never had a chance to begin with. So, Ms. Cassell, on the first of the problems that you have with the permits for life, can you explain how, under Clapper and precedents that require an injury to be either current or imminent, can you explain how that chain of events that might happen in the future, where federal standards are raised, Oklahoma doesn't keep up, these current people who have permits, you know, therefore fall behind with regard to the federal standards, how is that future injury imminent? Well, Your Honor, the federal government has already made changes to the federal rule that have strengthened that rule. And Oklahoma's requirements simply don't require the permits to be upgraded to match those improved requirements. And so folks like Mr. Frazier are already... So the federal standards are already higher than what Oklahoma requires of its permit holders? They're already higher than they were at the time Oklahoma... But that's not my question, Ms. Cassell. Are they higher than what Oklahoma requires of its permit holders? Your Honor, I'm putting us at a point in time, because what that issue here is, what EPA was looking at when it approved Oklahoma's program to begin with, and that was in 2018. And so, Your Honor, the rules are already more stringent than they were at the time EPA approved Oklahoma's program. Ms. Cassell, with respect, I want to ask the question, I think, a third time. I'm not asking whether EPA or federal standards are higher than they were in 2018. I'm asking whether the federal standards right now are more rigorous and higher than what Oklahoma currently requires of its permit holders. Your Honor, I know Oklahoma has said in its brief, it has included some facts that occurred, of course, after the record was considered by EPA, relating to some improvements that have been made or some changes that have been made to its rules. I don't know whether the changes that have been made to its rules currently match what the federal rules require. Because, Your Honor, of course, I was focused on EPA's reasonable decision at the time it decided to approve Oklahoma's program. And if we don't know whether Oklahoma's current standards are less rigorous than the federal standards require, how is your injury imminent with regard to your concern that in the future, the federal standards will become more rigorous than Oklahoma's standards? Your Honor, I think our understanding and our read of the Oklahoma rules is that even if those regulations have been changed, even if they have been upgraded to match changes to the federal rules, that itself does not compel the upgrading of the permits themselves for the facilities. Ms. Cassell, it seems highly speculative that the federal standards will increase faster than the Oklahoma standards increase. Maybe they will, maybe they won't. And I'm trying to give you the opportunity to tell me why it's not as speculative as I suspect it is. Your Honor, the problem with Oklahoma's program is that even if they do improve their rules and match the rules, and I would say to your note about it being speculative, federal EPA is required under the scheme of RCRA, which is aimed at improving and implementing new upgrades to waste disposal. They are required to take a look at their rules every few years and upgrade them if necessary. Oklahoma, as far as I know, doesn't have that same mandate in its rules. And even if its rules are upgraded, its rules do not translate any of those upgrades of the rules to the permits. So these same facilities may be stuck in the mud with priorly approved, outdated standards that no longer represent the most effective waste disposal methods. And Mr. Frazier and others are currently suffering because those permits are outdated and the facility is not as protective as it otherwise would be were those permits for life not in effect. Now, Your Honors, if I might spend just a couple minutes with one of the two other points I wanted to make. I just wanted to note that these permits that are being issued entirely behind closed doors are not anything like administrative as EPA has described them. They include things like groundwater monitoring, which if you don't have the right number of wells in the right locations, tested the right frequency, the heavy metal pollution that leaches out of those coal ash landfills gets out undetected and therefore is not cleaned up and continues to pollute waterways. It includes closure plans, which determine whether the ash will be left in place, potentially polluting for centuries, or whether it will be moved to a safer location. You know, EPA knew at the time it approved Oklahoma's program that folks like Mr. Frazier and many Oklahomans had been entirely deprived of the opportunity to weigh in on permits for that Grand River Dam Authority landfill permit for the northeastern coal ash landfill for others. Ms. Cassell, you said that those decisions are being made behind closed doors. I think that was your phrase. Are those decisions posted on a public website? Sir, yes, they are available by FOIA. How can something be posted on a public website and be behind closed doors? When a decision is made behind closed doors, Your Honor, what I was meaning was that it may be available for the public to hear after the decision is made. But when the decision is made without the participation, without the voices of the folks that are affected or potentially affected by it, then it's made behind closed doors with respect to those people like Mr. Frazier. And so just to conclude on seeing, you know, these folks, EPA knew that these folks had been excluded from the ability to participate to begin with. In putting input in and the opportunity to be heard had been denied them for these permits. EPA knew that they may never have a chance again to offer input and have an opportunity to be heard with regard to the management of these facilities that are impacting their livelihoods and their enjoyment of their lives. And very quickly, Your Honors, the context matters here. The document against which EPA compared Oklahoma's program for adequacy was itself the product of absolutely deprived public participation. That 2017 document, their interim final guidance document, initially had a 30-day comment period. A number of organizations requested an extension. That extension was, they were told that extension would be granted. And then four hours, four hours, Your Honors, before that original comment deadline, EPA reneged on that extension. So 50 groups that were poised to help inform EPA as to what public participation measures should be included in state programs were denied the opportunity to provide that input. So when EPA compared Oklahoma's flawed program against its flawed interim guidance document, it's no surprise it came out with a flawed program. So Your Honors, EPA says it supports and values public participation. We think actions speak louder than words. All Mr. Frazier is asking for is an opportunity to be heard. We'd ask you to right EPA's wrong here. Thank you. Okay, thank you, Ms. Cassell. We'll hear from Commission's Counsel now, Mr. Lundman. Good morning. Robert Lundman, representing EPA. I'm going to start with the final point that Waterkeeper ended up with about the 2017 guidance document. That document was publicly released, a notice in the Federal Register, it was available for comment, and the document also explains that EPA envisions an ongoing dialogue about the document. So it's just not correct that that document was released in kind of an underhand way with a limited opportunity for Waterkeeper and others to comment. Then Waterkeeper, of course, had the opportunity to comment and did on Oklahoma's program. When EPA published the proposed rule about approving the program, Waterkeeper commented, EPA responded, EPA finalized the rule. So there's no kind of procedural mess up here with the 2017 guidance. Can I ask you, Mr. Lundman, I think I said Commission, I obviously meant administration, EPA. Do you have a position on whether you didn't brief the issue of standing, or at least you didn't challenge standing? And you've heard some of the questions this morning. Does the government have a view on that set of questions? Sure. As you know, we did not brief or address standing. I think it's correct that they have standing here, but there's a big important if here. If their claims are limited, as they should be and as they were pleaded, to a challenge to the approval and the non-discretionary duty claim. I think there's lots of bleeding into other claims. For example, is a particular facility, and they identify some facilities, has the public participation process for that facility complied with Oklahoma law and federal law? And I think those sort of claims would have to be brought either in state court or in the state administrative process, or potentially in another lawsuit in federal court. But they're not before the court here, which is just concerned with the approval of the plan, of the program, Oklahoma program, and the non-discretionary duty claim. For both of those, I think we're, especially the non-discretionary duty claim, we're in the world of, it's a procedural claim. The court would order, if there were relief granted, would order EPA to comply with 6974B1. And how that compliance would play out and whether that would necessarily result in direct redress for Oklahoma, sorry, for Waterkeeper or not, is a little unclear. But in the procedural redressability cases, that showing is relaxed. So we haven't made an argument that they didn't meet it here. I think the questions about the permit for life and whether they have established standing to make that argument, again, if it's a facial challenge, which this is to the approval, I think there is a way to look at this as a relaxed redressability requirement. But to the extent that the court is entertaining the more specific challenges, particular facilities, I don't think they've connected the dots for those. I don't think they're properly pleaded in the complaint here, and I don't think they're properly before the court. And if they were, I think there would be a real standing problem with those two. Can I ask a question about public participation in the way that you're looking at the way in which the statutory provisions interrelate? Because one way to read it is that under 6945D1A, I think it is, the question for the government is whether the state regime matches up with the federal one. And if it's at least as protective. And once it is, that's the end of the story, and there's nothing more to be done. So there's not an independent public participation component in 6974 that adds that the work is done under 6945D1A, I think it is, once that assessment is made, that it's at least as protective. But I know you have a different view of it. Right. I mean, I think we are crediting the 6974D1 as an obligation to, you know, develop and publish minimum guidelines and that that is a freestanding obligation. Our argument on that is we don't have a readily ascertainable time limit for it. And so that it's not enforceable as a non-discretionary duty. Then our fallback argument, the one the district court agreed with, is that even if there is such a duty in 6974B1 about the guidelines, we have satisfied it here with the guidance. The guidance addresses this provision. It provides a, you know, three prongs to look at when considering whether a plan is providing sufficient public participation, a state plan. Why do you think there's something independent? I realize I think I cited 6945D1A instead of D1B. You probably understand that I'm looking at B rather than A. Sorry, a lot of numbers floating around in the mind. But under D1B, the statute says that the administrator shall approve a permit program or other system of prior approval if the administrator determines, et cetera, et cetera, that the state regime is at least as protective as the federal one. Then where's the notion coming from that 6974 has an independent set of obligations over and above that? You know, I think that's the fundamental obligation here. I do, you know, the question, I think it gets difficult and we haven't made this argument. Does it foreclose any other considerations in the combination of the shall language you quoted in D1B and then the two factors that follow? You know, I think, I think this argument goes to the question of just the approval of the plan and not their standalone argument about the nondiscretionary duty. We've got our arguments on that nondiscretionary duty point. But, you know, you know, I think part of the answer here is just, well, the agency here in the approval said it was looking at the public participation requirement 6974B1. And it was satisfied here. And that's what we're defending. I guess it's possible that we could take a more narrow view. But the flip side of this is EPA does value public participation here and is looking for ways to encourage it. And I know Waterkeeper thinks there should be more, but we think we've complied with the statutory requirement 6974B1 with the guidelines here. How do you justify different public participation or different tiers based on the interim guidance? Well, the interim guidance doesn't address tiering. It doesn't address, you know, Oklahoma's plan. It was put out before the plan. It says, you know, we should provide for public participation. And I think it's the third factor that discusses public hearings. And we believe that the only sensible way to interpret that is to have some sort of significance requirement because there are lots of permit modifications. And I don't think Waterkeeper is arguing to the contrary, that are, you know, administrative and that are not making a substantive change to how something important is regulated. Waterkeeper thinks there's a big gap here and that there are substantive changes that are not being captured. We don't think there is on the face of the program because Oklahoma's law says if there is a significant impact, and Oklahoma explained this in its submission, it will treat the permit decision as Tier 2 or 3. It's possible that Waterkeeper has found or will find instances where that is falling through the gaps and it's not being implemented correctly. And if that's the case, then Oklahoma should fix it. If Oklahoma does it, EPA will step in. But it's not a reason to disapprove the program as a whole, or this part of the program. It's a potential implementation error, not an error in the design of the program. Let me make sure my colleagues don't have additional questions for you, Mr. Lundman. Not for me. Thank you. Thank you, Mr. Lundman. We'll hear from Oklahoma now. Mr. Mantegatti. Thank you, Your Honor, and may it please the court. I do want to just tee off of all of your excellent questions. We agree that redressability is a real problem here with respect to standing and it sounds like my friend Ms. Castle's responses were all speculation about what might happen later on after Oklahoma's program is vacated if they prevail, because of course, as Your Honor's pointed out, if they do prevail, they'll have far fewer opportunities for public participation. Respectfully to Mr. Lundman, we don't think of this as simply a procedural standing issue here because they're not challenging the process by which EPA approved, they're challenging whether it met the statutory standards. So we don't think those procedural standing cases are really relevant here. To Judge Walker's questions, yes, you know, all of the upgrades to EPA's program to make their program more stringent after Oklahoma's approval have been mirrored in Oklahoma's program and there are compliance deadlines for those. We cover that I think on page 37 of our brief. And then back to your question, Judge Srinivasan, as you know, we argue in our brief that meeting the at least as protective standards with respect to public participation is the only standard they could actually key off of to decide whether or not Oklahoma has sufficient public participation, and we certainly do so. And to Judge Wilkins' question, in the interim final guidance at Joint Appendix, page 130, one of the things EPA says in their interim final guidance is that one of the things they'll consider is whether the state is using a public participation program that it has used in other programs that EPA has approved, let's say in the Clean Water Act context or the Clean Air Act context, and that's exactly what Oklahoma has done here, which is to use the same public participation program it uses across EPA programs. And I would say it's actually quite similar to EPA's own tiered solid waste program at 40 CFR section 270.42, where they create three categories of permit modifications and based on the categories have different levels of public participation in each. So, you know, our program is actually modeled off of longstanding EPA programs that recognize, as Mr. Lundman said, everybody recognizes that every single permit decision and permit modification can, as a practical matter, have full-blown notice and comment or public hearings. Can I ask you, I didn't read your brief to make the argument that once 6945, and I hope I get it right this time, D1B is satisfied, then there's nothing more to be done under 6974. I think we do make that argument that to the extent that there is a standard that you can apply in this statute, it would be at least as protective standard. And so I think we make that argument in two ways, by the way. One, to the extent that a rulemaking is required, setting out public participation, we think that that rulemaking is the 2015 federal coal ash rule, and that sets those public participation standards. But two, that, and just going through the logical train here, section 6974B1 requires minimum guidance on public participation. The 2015 rule sets public participation standards for coal ash. That rule was challenged as inconsistent with 6974B1 in this court. This court rejected that challenge. And then the Winn Act, after all of those things, says that state programs have to be at least as protective as the federal rules, which would have included the federal public participation rules, and Oklahoma's program certainly meets that standard. I think the only last thing I would say in response to what has already been said is that Miss Castle says that closure plans are necessarily going to be under tier one. But that's not true, as we explain in the record, that if a plant is changing from clean closure to closing in place, that's going to be a tier two. And I think you can find that at Joint Appendix page 184. And then Joint Appendix page 288 provides other examples of how we've upgraded things to tier two historically when they are important modifications. And there's also a mechanism by which, as I understand it, a party can challenge the treatment of something as a tier one and suggest that it should be treated as tier two actually because of the consequences. I think that's right. And that's part of our rulemaking process when we first classify things as tiers. There's, of course, what Judge Walker mentioned, the fact that all these documents are public. And then going from there, you have the citizen complaint process, you have citizen suits under RCRA, you have intervention in DEQ court actions. All of these are opportunities for public participation in even tier one permitting actions. All right. If my colleagues don't have additional questions for you, Mr. Matsugane, thank you. Thank you, Your Honor. Ms. Castle, we'll give you two minutes for rebuttal. Thank you very much, Your Honor. A few points in response to the questions that have been asked and the points raised. First of all, the Improvements Act, Your Honor, at 6945 D7 explicitly provides that nothing in the subsection affects any authority or other law already in effect. So because of that mandate, Your Honor, the Improvements Act clearly directs EPA that it can't ignore the pre-existing mandate that it already had in 6974B1. Simply saying that, because it has to have a program that's at least as protective as the federal COALESH rules in a way deprives EPA or, you know, does not authorize EPA to ensure compliance with 6974B1, they have to comply with that under the terms of the law. In fact, they would have to even under the terms of that particular subsection because there is no permit program or other program of prior approvals in the federal COALESH rule. So the only way that they could approve a program is by looking beyond the confines of the federal COALESH rule specifically. To Mr. Masangani's point, we didn't allege that in every single case, every single closure plan would necessarily be treated as Tier 1. What we're saying is EPA needs to look at the evidence that's reasonably before it and make a reasoned decision based on that information. While EPA says that closure plans with closure in place are precisely the type of document that would pose the potentially significant effects to be treated as warranting public participation, that's exactly what Oklahoma deprived public participation for for the Grand River Dam Authority landfill. It approved a closure plan for closure in place as Tier 1 without any opportunities for public participation whatsoever, Your Honors. So I think while we don't disagree with Mr. Lundman that there may be some limited exceptions, name changes, things like that, that could be considered administrative, it was plain to EPA on the record when it approved this program that that was not what was happening in Oklahoma and that major significant decisions were being made behind closed doors without any public input or opportunity to be heard. Can I ask one quick question, Chief Judge? Of course. I don't think in your brief that you say the 2015 rule fails to satisfy 69-74, but I could be mistaken about that. So so did you brief that? And if you didn't brief it, do you think that the 2015 rule satisfies 69-74? Yes, Your Honor, we did know that in our reply brief. Your Honor, as Mr. Masangani, and I apologize if I'm mispronouncing your name, stated, that rule was promulgated more than a year before the Improvements Act was issued. There were no permit programs in effect, nor were any authorized at that time. The federal COALESH rule was promulgated, so it could not have provided public participation for a permitting program that was not even yet authorized, that did not yet exist. Am I misremembering that in a separate lawsuit, you or someone challenged the 2015 rule as not satisfying 69-74 and that challenge was unsuccessful? I could be misremembering that as well. I believe you may be, Your Honor. There were other challenges to the COALESH rule, but it wasn't under that provision as far as I know. All right. Thank you very much for answering my questions. I had one last question. Is there a difference between how Oklahoma classifies groundwater sampling vis-a-vis the way that the federal government treats that? So, in other words, Oklahoma classified as Tier 1, kind of an administrative minor modification, whereas the federal government would treat it as a major modification? Well, Your Honor, as I noted earlier, there are no federal permits in effect. The federal government has not issued yet a federal permitting program for COALESH, but the, excuse me, corrective action and cleanup in the proposed rule were certainly treated as individual permits, and EPA stated in the preamble to the proposed CCR rule that groundwater monitoring is the single most critical set of protective measures that it's relying on to protect health and the environment. So surely EPA has acknowledged and recognizes that this is a very significant determination with regard to the groundwater monitoring. Thank you. Thank you, counsel. Thank you. We'll take this case under submission.
judges: Srinivasan, Wilkins, Walker